Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
Kyle Quackenbush (SBN 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com
Email: kquackenbush@girardsharp.com

*Attorneys for Plaintiff and the Proposed Class*

[additional counsel on signature block]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| C.A. Spalding Company, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD.; CIMC USA, INC.; CIMC INTERMODAL EQUIPMENT, LLC; SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. a/k/a "DONG FANG INTERNATIONAL CONTAINERS"; FLORENS ASSET MANAGEMENT (USA), LIMITED; FLORENS CONTAINER, INC.; CXIC GROUP CONTAINERS CO. LTD.; SINGAMAS CONTAINER HOLDINGS LTD.; BOLIANG MAI; TIANHUA HUANG a/k/a "T.H. HUANG"; YONGBO WAN; QIANMIN LI; YUQIANG ZHANG a/k/a "JAMES ZHANG"; SIONG SENG TEO a/k/a "S.S. TEO"; and VICK NAM HING MA a/k/a "VICK MA,"<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF STATE ANTITRUST, CONSUMER PROTECTION STATUTES, THE SHERMAN AND CLAYTON ACTS (15 U.S.C. §§ 1, 26), AND FOR UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff C.A. Spalding Company ("Spalding"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for damages, restitution, non-restitutionary disgorgement, and injunctive relief against Defendants China International Marine Containers (Group) Co., Ltd. ("CIMC"), CIMC USA, Inc. ("CIMC USA"), CIMC Intermodal Equipment, LLC ("CIMC Intermodal"), Shanghai Universal Logistics Equipment Co., Ltd. a/k/a Dong Fang International Containers ("Dong Fang"), Florens Asset Management (USA), Limited ("Florens USA"), Florens Container, Inc. ("Florens Container"), CXIC Group Containers Co. Ltd. ("CXIC"), Singamas Container Holdings Ltd. ("Singamas"), Boliang Mai, Tianhua Huang, Yongbo Wan, Qianmin Li, Yuqiang Zhang, Siong Seng Teo, and Vick Nam Hing Ma (collectively, "Defendants"), and unidentified Doe Defendants, for violations of Section 1 of the Sherman Act (15 U.S.C. § 1), Section 16 of the Clayton Act (15 U.S.C. § 26), and the antitrust and consumer protection statutes of multiple states, and for unjust enrichment, as set forth below.

## I.    INTRODUCTION

1.    This lawsuit concerns an agreement among horizontal competitors—the world's dominant manufacturers of standard dry shipping containers—to restrict output and fix prices for standard dry shipping containers sold to customers in the United States and worldwide.

2.    On January 22, 2026, a federal grand jury in this District returned a Superseding Indictment charging certain Defendants with a criminal conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.[1] The Indictment alleges a conspiracy to "restrict the output of and fix the prices of dry shipping containers sold to customers worldwide, including in the Northern District of California."[2]

3.    Standard dry shipping containers are the non-refrigerated steel boxes—commonly called "dry containers" or "dry boxes"—that carry the great majority of the world's seaborne cargo. According to the Indictment, millions of shipping containers cross the world's oceans each year,

---

[1] Superseding Indictment, *United States v. China Int'l Marine Containers (Grp.) Co., LTD.*, et al., No. 25-cr-00311-YGR (N.D. Cal. filed Jan. 22, 2026) [hereinafter Indictment].
[2] *Id.* ¶ 50.

1

CLASS ACTION COMPLAINT

carrying billions of dollars in goods destined for American households.[3] Shipping lines, logistics companies, and container lessors spend billions of dollars annually on standard dry containers.[4]

4. The manufacture of dry shipping containers is extraordinarily concentrated, largely in the People's Republic of China. The Indictment alleges that from at least 2019 through 2024, six "company conspirators"—CIMC, Dong Fang, CXIC, Singamas, and two unnamed Co-Conspirator Companies—together manufactured about 95 percent of the world's standard dry containers.[5] An assessment prepared by a Commissioner of the Federal Maritime Commission similarly describes the industry as concentrated in China, reporting that CIMC alone produces approximately 40 percent of the world's shipping containers, that the top three global manufacturers (CIMC, Dong Fang, and CXIC) produce an estimated 82 percent of containers globally, and that—according to the China Container Industry Association (the "CCIA")—Chinese companies collectively, led by CIMC, produce more than 95 percent of the world's shipping containers.[6]

5. According to the Indictment, beginning at least as early as November 2019 and continuing until at least as late as January 2024, Defendants and their co-conspirators agreed to restrict output and fix prices, and as a result, the prices of standard dry shipping containers roughly doubled between 2019 and 2021.[7] The Indictment alleges that the conspirators implemented their agreement through, among other means, limiting the number of shifts and hours each production line could run, refusing to build new factories, installing video surveillance cameras to police compliance, and establishing a fund to penalize cheating.[8]

6. The Indictment alleges that this conduct occurred amid the COVID-19 pandemic, during which delays affected shipping worldwide. While American consumers suffered shortages of

---

[3] *Id.* ¶ 1.
[4] *Id.*
[5] *Id.* ¶ 2.
[6] *See* Carl W. Bentzel, Assessment of P.R.C. Control of Container and Intermodal Chassis Manufacturing (Final Report) at 20 (Fed. Mar. Comm'n Mar. 2022) [hereinafter FMC Assessment]. The report is the individual assessment of Commissioner Bentzel and is not an official publication of the Federal Maritime Commission.
[7] Indictment ¶¶ 4, 44, 50.
[8] *Id.* ¶¶ 24, 27, 33.

CLASS ACTION COMPLAINT

goods ranging from electronics to medical supplies, and inflation surged—the dry container manufacturers reported increased profitability.[9]

7.      The Indictment further alleges that the charged conspiracy was directed at and substantially affected United States commerce because the company conspirators sold collusively and noncompetitively priced standard dry shipping containers to customers located in the United States, including in this District, thereby fixing "a component of global shipping costs—that is, the price of dry shipping containers—paid by United States importers" and increasing the shipping costs paid by United States importers.[10]

8.      Plaintiff and members of the Class are indirect payers who did not buy standard dry shipping containers directly from Defendants, but who nonetheless bore the overcharges caused by Defendants' alleged conspiracy—because those overcharges were passed through to them in the prices they paid for standard dry shipping containers, whether separately or as a component of the price of transportation or other services. Defendants' alleged conduct violated Section 1 of the Sherman Act and the antitrust and consumer protection statutes of multiple states, entitles Plaintiff and the Class to declaratory and injunctive relief under Section 16 of the Clayton Act, and unjustly enriched Defendants at the expense of Plaintiff and the Class. Plaintiff and the Class were injured because they paid more than they would have paid absent Defendants' unlawful restraint of trade.

9.      Defendants' alleged conspiracy was self-concealing and was affirmatively concealed. The Indictment alleges that the conspirators preferred to meet in person "to avoid the suspicion of industry monopoly," deleted incriminating emails, removed references to their "alliance" and "market discipline" from board and investor presentations because they were "sensitive under anti-trust law," and kept the agreement confidential "at a very high level."[11] Plaintiff and the Class did not discover, and could not through reasonable diligence have discovered, the alleged conspiracy until the existence of the criminal charges became public.

---

[9] *Id.* ¶¶ 3–4, 45–47.
[10] *Id.* ¶¶ 53–57.
[11] *Id.* ¶¶ 36, 48.

CLASS ACTION COMPLAINT

## II.　　JURISDICTION AND VENUE

10.　　This Court has subject-matter jurisdiction over Plaintiff's federal antitrust claim pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, the proposed Class consists of at least 100 members, and at least one member of the Class is a citizen of a State different from at least one Defendant.

11.　　This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), the doctrine of pendent personal jurisdiction, and the California long-arm statute (Cal. Code Civ. Proc. § 410.10). According to the Indictment, Defendants and their co-conspirators negotiated sales of, sold, and accepted payment for collusively and noncompetitively priced standard dry shipping containers from customers located in the United States, including in the Northern District of California.[12] CIMC has publicly described its substantial U.S. operating footprint. In its 2025 Annual Report, CIMC stated that the Group "continued to consolidate its strategy of globalized deployment, with its research and development centres and manufacturing bases located in nearly 20 countries and regions around the world, and more than 30 overseas entities and enterprises, mainly in Europe, North America and other regions," and that during the reporting period the Group's overseas revenue accounted for approximately 47.62 percent of total revenue.[13] Defendants purposefully directed their conduct at the United States and at this District, and the anticompetitive conduct alleged herein was intended to, and did, cause injury to persons and entities residing in, located in, or doing business in this District.

12.　　Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected trade and commerce was carried out in this District,

---

[12] *Id.* ¶ 52(i)–(k).

[13] China Int'l Marine Containers (Grp.) Co., Annual Report 2025 (English Version), at 24 (2026).

CLASS ACTION COMPLAINT

and Defendants transacted business and committed acts in furtherance of the alleged restraint of trade in this District, and, certain defendants do not reside in the United States and thus "may be sued in any judicial district." The Indictment, returned in this District, alleges that the charged conspiracy fixed the prices of standard dry shipping containers "sold to customers worldwide, including in the Northern District of California."[14]

## III.   INTRADISTRICT ASSIGNMENT

13.    Pursuant to General Order No. 44, § D(3), and Civil Local Rule 3-2, this action is an antitrust class action for which venue is proper in any courthouse in this District, and which is not subject to reassignment on the basis of intradistrict venue. Plaintiff nonetheless notes that the related criminal action, *United States v. China International Marine Containers (Group) Co., Ltd., et al.*, No. 25-cr-00311-YGR, is pending before the Honorable Yvonne Gonzalez Rogers in the Oakland Division of this Court, and that a substantial part of the events giving rise to Plaintiff's claims, including the importation and sale of collusively priced standard dry shipping containers into and through the District, is connected with the counties assigned to that Division.

## IV.   PARTIES

### A.   PLAINTIFFS

14.    Plaintiff C.A. Spalding Company ("Spalding") is a corporation incorporated under the laws of Pennsylvania, with its headquarters and principal place of business at 1200 W. Industrial Park Drive, Suite B, Nogales, Arizona 85621. During the Class Period, Spalding regularly imported component parts and goods from overseas suppliers, including from the People's Republic of China, in standard dry shipping containers of the type manufactured by Defendants and their co-conspirators, who together produced approximately 95 percent of the world's standard dry shipping containers from at least 2019 through 2024.[15] Spalding's shipments during the Class Period were carried on ocean vessels operated by multiple international ocean carriers and were transported in standard dry shipping containers leased to those carriers (or to their freight-forwarder customers) by several of the world's largest international container leasing companies. By way of example, in addition to the August 2021

---

[14] Indictment ¶ 50; *see also id.* ¶¶ 52(i)–(k), 53.
[15] *See* Indictment ¶ 2.

exemplar shipment described in detail below, Spalding's imports during the Class Period included a June–July 2023 shipment carried aboard the Motor Vessel ("M/V") YM Wellspring (Voyage 016E) in 40-foot standard dry shipping container TGBU6388178—a container registered to Textainer Equipment Management Ltd.—and an October 2021 shipment carried aboard the M/V EVER FAME (Voyage 1212-004E) in 40-foot standard dry shipping container BSIU9486251—a container registered to Blue Sky Intermodal (U.K.) Ltd. Each such shipment was discharged at a United States West Coast port (for example, the Port of Los Angeles or the Port of Long Beach, California) and was delivered by truck to Spalding's Nogales, Arizona facility.

15.     The exemplar shipment alleged in detail here moved during the alleged supracompetitive pricing period charged in the Indictment. On August 21, 2021, Spalding's overseas supplier loaded transformer parts and accessories at Hong Kong into 40-foot standard dry shipping container TCLU8814681, which was carried aboard the M/V COSCO NETHERLANDS (Voyage 045E) under Ocean Bill of Lading No. OOLU2032496901, discharged at the Port of Long Beach, California, on or about September 5, 2021, and delivered to Spalding's Nogales, Arizona, facility. According to the publicly searchable BIC Code registry, the "TCLU" prefix borne by that container is registered to Triton Container International Ltd. Triton Container International Ltd. is a subsidiary of Triton International Limited[16] ("Triton"), which described itself in its Annual Report on Form 10-K filed with the United States Securities and Exchange Commission as "the world's largest lessor of intermodal containers."[17] In Triton's Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2021, Triton expressly disclosed the source of its container fleet: "We purchase most of our equipment from third-party manufacturers based in China. There are four large manufacturers of dry containers . . . [and] we estimate that the four largest manufacturers account for more than 90% of

---

[16] Triton Int'l Ltd., Annual Report (Form 10-K), Ex. 21.1 (Subsidiaries of Triton International Limited as of December 31, 2021) (filed Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/0001660734/000166073422000038/exhibit21112-31listofsubsi.htm (listing "Triton Container International Limited" as a Bermuda-jurisdiction subsidiary).

[17] Triton Int'l Ltd., Annual Report (Form 10-K), at 6 (filed Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/0001660734/000166073422000038/trtn-20211231.htm (Item 1. Business, Our Company) ("Intermodal containers are large, standardized steel boxes used to transport freight by ship, rail or truck.").

global production volume."[18] In a publicly issued earnings release dated April 29, 2021— approximately four months before Spalding's exemplar shipment—Triton's Chief Executive Officer stated that "Container factories are currently quoting over $3,500 for a new 20' dry container."[19] Triton subsequently disclosed that it had purchased "$3.6 billion of containers that were delivered in 2021."[20] These contemporaneous prices are consistent with the supracompetitive pricing alleged in the Indictment to have resulted from the charged conspiracy.[21] Container TCLU8814681 was manufactured by one of the Defendants or an unnamed Co-Conspirator Company and was acquired by Triton at supracompetitive prices that reflected the overcharge attributable to Defendants' alleged unlawful conduct.

16.    The vessel and master bill of lading on Spalding's August 2021 exemplar shipment were issued by entities corporately affiliated with three of the Defendants under common ultimate ownership. COSCO SHIPPING Holdings Co., Ltd. ("COSCO Shipping Holdings") "is the listed company controlled by China COSCO SHIPPING Corporation Limited" and, as of December 31, 2021, operated its container shipping fleet "through its wholly-owned subsidiary COSCO SHIPPING Lines and its holding subsidiary Oriental Overseas International (0316.HK)."[22] The M/V COSCO NETHERLANDS that carried Spalding's August 2021 shipment is operated by COSCO Shipping Holdings' wholly-owned subsidiary COSCO Shipping Lines Co., Ltd. ("COSCO Shipping Lines"), and the master bill of lading for that shipment (No. OOLU2032496901) was issued by Orient Overseas

---

[18]Triton Int'l Ltd., Annual Report (Form 10-K), at 10 (filed Feb. 14, 2022), https://www.sec.gov/Archives/edgar/data/0001660734/000166073422000038/trtn-20211231.htm (Item 1. Business, Suppliers).

[19] Press Release, Triton Int'l Ltd., *Triton International Reports First Quarter 2021 Results and Declares Quarterly Dividend* (Apr. 29, 2021) (statement of Brian M. Sondey, Chief Executive Officer), https://www.businesswire.com/news/home/20210429005196/en.

[20]Press Release, Triton Int'l Ltd., *Triton International Reports Fourth Quarter and Full Year 2021 Results and Declares Quarterly Dividend* (Feb. 15, 2022), https://www.tritoninternational.com/news/press-release/81310/triton-international-reports-fourth-quarter-and-full-year-2021-results-and-declares-quarterly-dividend.

[21]Indictment ¶¶ 4, 44 (alleging that prices for standard dry shipping containers roughly doubled between 2019 and 2021, including to over $3,500 for a 20-foot container and over $5,900 for a 40-foot container).

[22] Press Release, COSCO SHIPPING Holdings Co., Ltd., *COSCO SHIPPING Holdings Announces 2021 Annual Results* (Mar. 30, 2022), https://www.nasdaq.com/press-release/cosco-shipping-holdings-announces-2021-annual-results-2022-03-30.

CLASS ACTION COMPLAINT

Container Line Limited ("OOCLL," doing business as "OOCL"), a wholly-owned subsidiary of Orient Overseas (International) Limited ("OOIL"), which COSCO Shipping Holdings acquired in July 2018. As separately alleged herein, Defendant Shanghai Universal Logistics Equipment Co., Ltd. ("Dong Fang"), Defendant Florens Asset Management (USA), Limited, and Defendant Florens Container, Inc. are subsidiaries of COSCO SHIPPING Development Co., Ltd. ("COSCO Shipping Development"). COSCO Shipping Holdings (the parent of COSCO Shipping Lines and OOCL) and COSCO Shipping Development (the parent of Defendant Dong Fang and the Florens Defendants) are each subsidiaries of China COSCO SHIPPING Corporation Limited, a multinational marine transportation conglomerate headquartered in Shanghai, China. COSCO Shipping Lines and OOCL are accordingly corporate siblings of Defendants Dong Fang, Florens USA, and Florens Container under common ultimate ownership.

**B.     DEFENDANTS**

17.     **Defendant China International Marine Containers (Group) Co., Ltd. ("CIMC")** is, according to the Indictment, a publicly traded company organized and existing under the laws of the People's Republic of China that was engaged in the business of manufacturing standard dry shipping containers and selling them to customers in the United States and elsewhere.[23] The FMC Assessment describes CIMC as China's "national champion" for containers and the world's largest container manufacturer, producing approximately 40 percent of the world's shipping containers.[24]

18.     **Defendant CIMC USA, Inc. ("CIMC USA")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 289 East Water Tower Drive, Monon, Indiana 47969, and is a subsidiary of CIMC. CIMC USA is registered to do business in California (Entity No. 3578907) and has designated CSC – Lawyers Incorporating Service as its agent for service of process in California. CIMC USA is engaged in the business of manufacturing shipping containers. CIMC USA is the corporate vehicle through which CIMC sells container and chassis products to customers in the United States, including in this District.

---

[23] Indictment ¶ 5.
[24] FMC Assessment at 20.

CLASS ACTION COMPLAINT

19.     **Defendant CIMC Intermodal Equipment, LLC ("CIMC Intermodal")** is a subsidiary of CIMC headquartered at 10530 Sessler Street, South Gate, California, 90280, and engaged in the manufacture and sale of intermodal container chassis and related equipment for the North American market.[25] CIMC Intermodal was formed in 2011 when CIMC acquired the remaining 40 percent of Texas-based Direct Chassis (CIMC had acquired the initial 60 percent in 2008), folded the company into CIMC USA, renamed it CIMC Intermodal Equipment, and relocated its operations from Texas to South Gate, California, where it assembles chassis from steel sub-assemblies produced by CIMC in China combined with domestically sourced components.

20.     **Defendant Shanghai Universal Logistics Equipment Co., Ltd. ("Dong Fang")**, according to the Indictment, is a company organized and existing under the laws of the People's Republic of China that owned, managed, and did business as a brand of shipping containers called Dong Fang International Containers (also known as DF, DFIC, or Dong Fang), and was engaged in the business of manufacturing standard dry shipping containers and selling them to customers in the United States and elsewhere. According to the corporate-structure disclosures published by COSCO SHIPPING Development Co., Ltd. ("COSCO Shipping Development"), Dong Fang is a wholly-owned subsidiary of China Shipping Investment Co., Ltd., which is itself a wholly-owned subsidiary of COSCO Shipping Development. COSCO Shipping Development is in turn 46.80 percent held by China Shipping Group Company Limited (which is wholly owned by China COSCO SHIPPING

---

[25] *See* Statement of Information, CIMC Intermodal Equipment, LLC, Cal. Sec'y of State File No. BA20251696499 (filed Aug. 21, 2025) (Entity No. 201113710003); CIMC Intermodal Equipment, Business View Magazine (Dec. 7, 2017), https://businessviewmagazine.com/cimc-intermodal-equipment/.

CLASS ACTION COMPLAINT

Corporation Limited) and 0.36 percent held directly by China COSCO SHIPPING Corporation Limited.[26]



21.    COSCO Shipping Development describes itself as "the world's second-largest container manufacturer."[27] COSCO Shipping Development further states publicly that Dong Fang manages Dongfang International Container (Qidong) Co., Ltd., a container manufacturing facility that was fully acquired by China COSCO SHIPPING Corporation Limited in 2019.[28] According to COSCO Shipping

---

[26] Company Structure, COSCO Shipping Dev. Co., http://en.development.coscoshipping.com/col5352/art/2016/art_5352_51358.html (last visited May 28, 2026) (shareholding ratios as of June 30, 2025).
[27] Company Profile, COSCO Shipping Dev. Co., http://en.development.coscoshipping.com/col/col5345/index.html (last visited May 28, 2026).
[28] Corporate Profile, Dongfang Int'l Container (Qidong) Co., Ltd. http://en.dficqd.huanyu.development.coscoshipping.com/col27514/art/2023/art_27514_333081.html (last visited May 28, 2026).

CLASS ACTION COMPLAINT

Development's 2025 Annual Report, its container-manufacturing operations include "six container manufacturing facilities."[29]

22.     **Defendant Florens Asset Management (USA), Limited ("Florens USA")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 15600 John F. Kennedy Blvd., Suite 150, Houston, Texas 77032. Florens USA is registered to do business in California (Entity No. 1994682) and has designated C T Corporation System as its agent for service of process in California. Florens USA is an indirect subsidiary of COSCO SHIPPING Development Co., Ltd., the publicly held parent of Defendant Dong Fang. Florens publicly identifies Florens USA as its "North American Headquarters."[30]

23.     **Defendant Florens Container, Inc. ("Florens Container")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 15600 John F. Kennedy Blvd., Suite 150, Houston, Texas 77032—the same address as Florens USA. Florens Container is registered to do business in California (Entity No. 4296201) and has designated C T Corporation System as its agent for service of process in California. According to its California Statement of Information, Florens Container's type of business is "Selling and leasing container." Florens Container is an indirect subsidiary of COSCO SHIPPING Development Co., Ltd. and shares the same executive officers as Florens USA.

24.     **Defendant CXIC Group Containers Co. Ltd. ("CXIC")**, according to the Indictment, is a company organized and existing under the laws of the People's Republic of China that was engaged in the business of manufacturing standard dry shipping containers and selling them to customers in the United States and elsewhere.[31] CXIC describes itself on its corporate website as "a private enterprise group integrating manufacturing, trade, transportation, and development."[32] CXIC further publicly states on its corporate website that it operates five major production bases located in

---

[29] COSCO Shipping Dev. Co., Annual Report 2025, at 8 (2026).
[30] North American Headquarters, Florens, https://www.florens.com (last visited May 21, 2026).
[31] Indictment ¶ 7.
[32] About CXIC, CXIC Group Containers Co. Ltd., http://en.cxic.com/landpage_Group-overview.html (last visited May 28, 2026).

CLASS ACTION COMPLAINT

Jiangsu Changzhou, Zhejiang Ningbo, Zhejiang Jiaxing, Shandong Qingdao, and Tianjin, all in the People's Republic of China, and that its global market share exceeds 16 percent.[33]

25.    **Defendant Singamas Container Holdings Ltd. ("Singamas")**, according to the Indictment, is a publicly traded company organized and existing under the laws of Hong Kong in the People's Republic of China that was engaged in the business of manufacturing standard dry shipping containers and selling them to customers in the United States and elsewhere.[34] In its 2023 Annual Results Investor Presentation Q&A (dated March 14, 2024), Singamas publicly identified "Pacific International Lines" ("PIL") as its "mother company."[35] Singamas's 2025 Annual Report confirms that PIL holds 993,825,345 shares of Singamas, representing 41.72 percent of total issued shares, and that PIL Pte. Ltd. and Temasek Holdings (Private) Limited are ultimate controlled-corporation parents.[36]

26.    Defendants CIMC, Dong Fang, CXIC, and Singamas are referred to herein collectively as the "Manufacturer Defendants."

27.    **Defendant Boliang Mai**, according to the Indictment, was employed by CIMC in various senior roles, serving as President and Chief Executive Officer of CIMC from August 2015 through July 2020 and as Chairman and Chief Executive Officer from August 2020 through the period covered by the Indictment, and is believed to be a resident of the People's Republic of China.[37]

28.    **Defendant Tianhua Huang**, also known as "T.H. Huang," according to the Indictment, was employed by CIMC as Vice President and is believed to be a resident of the People's Republic of China.[38]

29.    **Defendant Yongbo Wan**, according to the Indictment, was employed by CIMC as General Manager of CIMC's Operation Management Center and is believed to be a resident of the People's Republic of China.[39]

---

[33] About CXIC, CXIC Group Containers Co. Ltd., http://en.cxic.com/landpage_Group-overview.html (last visited May 21, 2026).
[34] Indictment ¶ 8.
[35] Singamas Container Holdings Ltd., 2023 Annual Results Investor Presentation Q&A 1 (Mar. 14, 2024).
[36] Singamas Container Holdings Ltd., Annual Report 2025, at 88 (2026).
[37] Indictment ¶ 12.
[38] *Id.* ¶ 13.
[39] *Id.* ¶ 14.

CLASS ACTION COMPLAINT

30.    **Defendant Qianmin Li**, according to the Indictment, was employed by Dong Fang as General Manager and is believed to be a resident of the People's Republic of China.[40]

31.    **Defendant Yuqiang Zhang**, also known as "James Zhang," according to the Indictment, was employed by CXIC as Chief Executive Officer and is believed to be a resident of the People's Republic of China.[41]

32.    **Defendant Siong Seng Teo**, also known as "S.S. Teo," according to the Indictment, was employed by Singamas as Chief Executive Officer and Chairman and is believed to be a resident of the Republic of Singapore.[42]

33.    **Defendant Vick Nam Hing Ma**, also known as "Vick Ma," according to the Indictment, was employed by Singamas as Marketing Director and is believed to be a resident of Hong Kong, People's Republic of China.[43]

34.    Doe Defendants 1–100 are other individuals or entities that engaged in, or aided and abetted, the unlawful conduct alleged herein. The Indictment alleges that various companies and individuals not named as defendants in the Indictment, including two unnamed "Co-Conspirator Companies" organized under the laws of the People's Republic of China, participated as co-conspirators in the charged offense.[44] Plaintiff intends to amend, or seek leave to amend, this Complaint upon learning the identities of the Doe Defendants.

## V.    AGENTS AND CO-CONSPIRATORS

35.    The anticompetitive and unlawful acts alleged against the Manufacturer Defendants were authorized, ordered, or performed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management, direction, or control of the Manufacturer Defendants' businesses or affairs. This allegation is consistent with the Indictment, which alleges that whenever reference is made to any act of a company, the company engaged in the act by or through its

---

[40] *Id.* ¶ 15.
[41] *Id.* ¶ 16.
[42] *Id.* ¶ 17.
[43] *Id.* ¶ 18.
[44] *Id.* ¶¶ 9–10, 19.

CLASS ACTION COMPLAINT

officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.[45]

36. Each Manufacturer Defendant's agents operated under the actual and apparent authority of their respective principals. The individual Defendants are alleged to have acted on behalf of, and within the scope of their employment by, the Manufacturer Defendants that employed them.[46]

37. Various other persons and entities not named as Defendants herein—including, according to the Indictment, Co-Conspirator Company A, Co-Conspirator Company B, and other companies and individuals known and unknown—participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.[47]

38. Each Defendant acted as the principal or agent of, or for, other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## VI.　CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action for damages, restitution, non-restitutionary disgorgement, and declaratory and injunctive relief on behalf of itself and the following classes of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and, where applicable, 23(c)(4) (collectively, the "Class" or the "Classes"). The Class Period is November 14, 2019, until such time as the adverse effects of Defendants' anticompetitive conduct cease.

> **Damages Class** (Counts One, Two, and Three): All persons and entities that, during the Class Period, indirectly paid in the Class States for the cost of one or more standard dry shipping containers that were manufactured by one or more Defendants or co-conspirators, including as a component of the price of transportation or other services, for their own use and not for resale (the "indirect payers").

> **Nationwide Injunctive Class** (Count Four): All persons and entities in the United States that, during the Class Period, indirectly paid for the cost of one or more standard dry shipping containers that were manufactured by one or more Defendants or co-conspirators, including as a component of the price of transportation or other services, for their own use and not for resale (the "indirect payers").

---

[45] *Id.* ¶ 20.
[46] *See id.* ¶¶ 12–18.
[47] *Id.* ¶¶ 9–10, 19.

CLASS ACTION COMPLAINT

40.    "Class States" includes the following jurisdictions: Alaska, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and/or Wisconsin.

41.    Excluded from the Class are: (a) Defendants and their officers, directors, management, employees, parents, subsidiaries, and affiliates; (b) any co-conspirators; (c) all governmental entities; (d) the judges and chambers staff assigned to this case, together with the members of their immediate families; and all jurors assigned to this case. Plaintiff reserves the right to modify, amend, or refine the Class definition based on discovery and further investigation, and to propose subclasses as appropriate.

42.    Numerosity. Plaintiff does not know the exact number of members in the Classes but alleges that, due to the nature of the trade and commerce involved, there are so many Class members geographically dispersed throughout the United States such that joinder of all members is impracticable. The Indictment alleges that standard dry shipping containers carry billions of dollars of goods into the United States and that the company conspirators' "mainstream customers" included major United States-based container lessors, shipping lines, and logistics companies.[48]

43.    Commonality and Predominance. Numerous questions of law and fact common to the Class arise from Defendants' conduct and predominate over any questions affecting only individual members, including, without limitation:

    a.    Whether Defendants and their co-conspirators agreed to restrict the output of, and to fix, raise, and/or stabilize the prices of, standard dry shipping containers during the Class Period;

    b.    Whether Defendants' conduct constituted a per se violation of Section 1 of the Sherman Act;

    c.    Whether Defendants' conduct violated the state antitrust statutes pled in Count One;

---

[48] *Id.* ¶¶ 1, 30.

CLASS ACTION COMPLAINT

      d.      Whether Defendants' conduct constituted unfair competition or unfair, unconscionable, fraudulent, or deceptive acts or practices in violation of the state consumer protection statutes pled in Counts Two and Three;

      e.      Whether Defendants' conduct caused the prices of standard dry shipping containers to be higher than they would have been in a competitive market, and whether and to what extent those overcharges were passed through to indirect payers;

      f.      Whether Plaintiff and the Class were injured by Defendants' conduct and, if so, the appropriate measure of Class-wide damages or restitution;

      g.      Whether Plaintiff and the Class are entitled to declaratory and injunctive relief under Section 16 of the Clayton Act and other applicable law; and

      h.      Whether Plaintiff and the Class are entitled to restitution, non-restitutionary disgorgement, or other equitable relief, and, if so, the nature and extent of such relief.

44.      Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members were injured by the same alleged wrongful conduct of Defendants—namely, by paying overcharges on standard dry shipping containers, or on transportation services incorporating the cost of such containers, that were inflated by Defendants' unlawful restraint of trade.

45.      Adequacy. Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in the prosecution of antitrust and complex class-action litigation.

46.      Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treating Defendants' conduct as applied to the Class as a whole will conserve judicial resources, avoid the risk of inconsistent adjudications, and afford relief to Class members whose individual damages may be too small to justify the expense of individual litigation.

47.      Class certification is also appropriate under Rules 23(b)(1), (b)(2), (b)(3), and/or (c)(4) because:

16

CLASS ACTION COMPLAINT

48.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants;

49.    The prosecution of separate actions by individual Class Members would create a substantial risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

50.    Defendants acted, or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

51.    The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## VII.    INDUSTRY BACKGROUND

### A.    The Market for Standard Dry Shipping Containers

#### i.    What Standard Dry Shipping Containers Are

52.    Maritime transport carries the great majority of international trade: more than 80 percent of the volume of world merchandise trade moves by sea, and approximately 90 percent of the United States' overseas foreign trade moves by water. That trade moves in a shipping container—the standardized, sealed steel box that is carried intact across oceans, by rail, and on roads without rehandling the cargo inside. The use of shipping containers transformed international shipping in the latter half of the twentieth century, sharply reducing cargo-handling costs and transit times and helping to drive the modern growth of global trade.

53.    Because containers must move interchangeably among ships, cranes, railcars, and truck chassis built throughout the world, their external dimensions, strength, and corner fittings are standardized; the International Organization for Standardization ("ISO") prescribes the dimensions and ratings of "Series 1" freight containers so that any compliant box can be stacked, lifted, and secured by standardized handling equipment worldwide. Capacity is measured in "twenty-foot equivalent units," or "TEUs"; a 20-foot container equals one TEU and a 40-foot container two TEUs. Containers are made in several types suited to different cargo: general-purpose "dry" containers (enclosed steel boxes

17

CLASS ACTION COMPLAINT

for general cargo); refrigerated containers, or "reefers," which carry powered cooling units for temperature-sensitive cargo such as food and pharmaceuticals; open-top containers, loaded from above for tall or awkward cargo; flat-rack containers, which carry heavy or oversized items such as machinery and vehicles; and tank containers for liquids, chemicals, and gases.

54. Of these types, the general-purpose dry container—the non-refrigerated "dry box" at issue here—is the most widely used; the standard 20-foot dry container alone has accounted for more than a quarter of the global container equipment pool. The Indictment describes dry containers as general-purpose enclosed boxes made of rust-retardant steel that "[s]hipping lines, logistics companies, and retailers used . . . to ship various goods across the world, including into, out of, and throughout the United States."[49] It identifies four standard dry dimensions: (i) 20-feet long at a shorter height; (ii) 40-feet long at a shorter height; (iii) 40-feet long at a taller "high-cube" height; and (iv) 45-feet long at the high-cube height.[50]

### ii. The Market Is Concentrated Among a Few Manufacturers

55. The overwhelming majority of standard dry containers are manufactured in the People's Republic of China: industry analysts estimate that manufacturers based in China account for over 96 percent of global container output.[51] The Indictment alleges that the six company conspirators together manufactured about 95 percent of the world's standard dry containers from at least 2019 through 2024.[52] CIMC itself has publicly described its dominant market position. In its 2025 Annual Report, CIMC stated: "[T]he Group is ranked No. 1 in the world in terms of production volume of standard dry containers, reefer containers and special-purpose containers," citing the 2025/26 Container Equipment Survey and Leasing Market Annual Report issued by Drewry.[53] The 2025 Annual Report further states that CIMC's "container manufacturing business has been leading the world in terms of production and sales volume since 1996."[54]

---

[49] *Id.* ¶ 21.
[50] *Id.* ¶ 22.
[51] Drewry, *Talk of Phasing Out*, *supra* note 81 (manufacturers based in China account for over 96 percent of global container output).
[52] Indictment ¶ 2.
[53] China Int'l Marine Containers (Grp.) Co., Annual Report 2025 (English Version), at 24 (2026).
[54] *Id.* at 26.

CLASS ACTION COMPLAINT

56.    COSCO SHIPPING Development Co., Ltd., the publicly held parent of Defendant Dong Fang, similarly states in its public Company Profile that it "is ranked as the world's second-largest container manufacturer" and that its container-manufacturing customers are "world-renowned liner companies and major container leasing companies."[55]

57.    Defendant CXIC publicly states on its corporate website that its "global market share exceeds 16%," and that its production capacity is approximately "1.2 million TEU/year for standard containers and 100,000 units/year for special containers."[56]

58.    The FMC Assessment likewise describes the container-manufacturing industry as a "near de facto worldwide monopoly" dominated by Chinese producers. It reports that CIMC alone produces approximately 40 percent of the world's shipping containers, that the top three global manufacturers—CIMC, Dong Fang, and CXIC—are all located in China and produce an estimated 82 percent of containers globally, and that, according to the CCIA, Chinese companies collectively, led by CIMC, produce more than 95 percent of the world's shipping containers.[57]

59.    The Manufacturer Defendants also operate within a common industry trade body. The CCIA is a nationwide trade association of the Chinese container manufacturing industry, established in 1993 and headquartered in Beijing. The CCIA publicly described itself as a "nationwide social organization"[58] and publishes industry statistics that international observers rely on, including the global market-share figures cited in the FMC Assessment. Each of the Manufacturer Defendants is a member of the CCIA. Contemporaneous reporting by Drewry Shipping Consultants Limited ("Drewry"), an independent maritime research consultancy, attributed effective control of the CCIA to Defendant CIMC, with Drewry's John Fossey stating in May 2021 that the strategies of the major

---

[55] Company Profile, COSCO Shipping Dev. Co., http://en.development.coscoshipping.com/col/col5345/index.html (last visited May 28, 2026).

[56] About CXIC, CXIC Group Containers Co. Ltd., http://en.cxic.com/landpage_Group-overview.html (last visited May 21, 2026).

[57] FMC Assessment at 20.

[58] China Container Industry Ass'n, *Introduction to China Container Industry Association*, About CCIA, https://web.archive.org/web/20210923000000/http://ccia.chinaccia.com/index.php?id=298 (archived Sept. 23, 2021).

CLASS ACTION COMPLAINT

Chinese container manufacturers are "to some extent controlled by" the CCIA and that "CIMC, which is far and away the largest, really runs the CCIA."[59]

### iii.    The Chain of Distribution

60.    Three categories of customers buy standard dry containers directly from the manufacturers: ocean shipping lines (the carriers that operate container vessels), container leasing companies ("lessors"), and logistics companies.[60]

61.    Goods imported into the United States in a standard dry container typically move through the following chain. The shipper's goods are loaded into a container either at the shipper's factory or warehouse or at a consolidation warehouse known as a Container Freight Station ("CFS"), where cargo from multiple shippers can be combined into a single container.

62.    The loaded container is then carried by an ocean shipping line—the operator of a container vessel—from a foreign port of loading to a United States port of discharge. The ocean shipping line either owns the container outright (having purchased it from a manufacturer) or leases it from a container leasing company that purchased it from a manufacturer. Either way, the cost of the container is reflected in the ocean freight rate the shipping line charges to move cargo in that container.

63.    Each containerized shipment is documented by a bill of lading—the contract of carriage between the shipping line and the entity whose cargo is being shipped, identifying the vessel, voyage, container, port of loading, and port of discharge. When the shipping line issues the bill directly to a freight forwarder or other intermediary that has booked space on the vessel, that document is called a Master Bill of Lading.

64.    Most United States importers do not deal with an ocean shipping line directly. Instead, they engage a freight forwarder—also called a non-vessel operating common carrier, or "NVOCC"— which acts as an intermediary. The forwarder books space on the vessel under a Master Bill of Lading with the shipping line, arranges for the cargo to be loaded into the container at the CFS, and issues its

---

[59] Greg Miller, *How Three Chinese Companies Cornered Global Container Production*, FreightWaves (May 24, 2021), https://www.freightwaves.com/news/how-three-chinese-companies-cornered-global-container-production.

[60] Indictment ¶ 1 (alleging that "[s]hipping lines, logistics companies, and container lessors spend billions of dollars per year on standard dry containers"); *see also id.* ¶ 30 (identifying "major U.S.-based container lessors, shipping lines, and logistics companies" among the conspirators' customers).

CLASS ACTION COMPLAINT

own House Bill of Lading to the importer. The House Bill of Lading references the same vessel, voyage, and container as the Master Bill, but is the document the importer relies on to take delivery of its cargo at the destination.

65.     The freight forwarder then bills the importer for the full cost of moving the cargo from origin to destination. The forwarder's invoice typically includes ocean freight (the shipping line's charge for use of the vessel and container), CFS charges for handling and consolidation at the origin warehouse, terminal handling charges at both ends, and documentation and handling fees. The shipping line's ocean freight rate is set to recover the cost of the standard dry containers it has purchased or leased, and the forwarder passes that cost—together with its own markup—through to the importer.

66.     In this way, an overcharge on standard dry containers at the manufacturer level is built into the ocean freight rate quoted by the shipping line, passed through by the freight forwarder, and ultimately paid by the United States importer on the invoices it receives for each of its inbound shipments.

67.     Container leasing companies own a large and growing share of the world's container fleet and have accounted for a majority of new-container purchases in recent years, with shipping lines purchasing or leasing the balance. The carriers and lessors that own these containers make them available to the cargo interests—importers, exporters, and retailers, known in the industry as "beneficial cargo owners," or "BCOs"—whose goods move inside them.

**B.     How Defendants' Overcharge Reached Indirect Payers**

   **i.     The Conspiracy Targeted United States Import Commerce**

68.     The charged conspiracy was aimed at and substantially affected commerce in the United States. The company conspirators sold collusively and noncompetitively priced standard dry containers to customers located in the United States,[61] and the conspiracy "involved U.S. import trade or commerce" and was "closely connected with, and directed at, the importation of goods into the United States."[62]

---

[61] Indictment ¶ 53(a).
[62] *Id.* ¶ 53; 53(b).

CLASS ACTION COMPLAINT

69. The Indictment alleges that the conspiracy had a direct, substantial, and reasonably foreseeable effect on United States import, domestic, and export trade or commerce, because the conspirators "agreed to raise prices and restrict output of dry shipping containers, which increased shipping costs paid by United States importers."[63] After arriving at United States ports—most containerized imports enter through a small number of gateways, including the Ports of Los Angeles, Long Beach, and Oakland—the containers and their cargo then travel in interstate commerce by rail and truck to reach purchasers throughout the United States, including in California.[64]

### ii.  The Overcharge Was Passed Through to Indirect Payers

70. Because the price of a standard dry container is a component of the cost of containerized shipping, as alleged above, an unlawful overcharge on containers raises the cost of moving goods and is passed on, in whole or in part, down the distribution chain. Economic research confirms that increases in ocean-shipping costs are passed through to the prices of imported goods and, ultimately, to United States producer and consumer prices: the Federal Reserve Bank of Kansas City has estimated that a 15 percent increase in shipping costs leads to roughly a 0.10 percentage-point increase in United States core inflation after one year.[65] The Federal Reserve Bank of St. Louis found that the surge in shipping prices during the pandemic—which it estimated at about 86 percent on average—implied an increase in import-price inflation of nearly six percentage points per year.[66] The

---

[63] *Id.* ¶ 54; *see id.* ¶¶ 55–57.

[64] Indictment ¶ 55; *see* U.S. Dep't of Transp., Fed. Highway Admin., *Freight Facts and Figures*, Top U.S. Container Ports by Containerized Cargo, https://ops.fhwa.dot.gov/freight/freight_analysis/nat_freight_stats/docs/05factsfigures/fig2_8.htm (Los Angeles handles about one-fifth, and Los Angeles and Long Beach together more than one-third, of U.S. water-port container traffic).

[65] Trenton Herriford, Elizabeth M. Johnson, Nicholas Sly & A. Lee Smith, *How Does a Rise in International Shipping Costs Affect U.S. Inflation?*, Fed. Rsrv. Bank of Kansas City Econ. Bull. (Dec. 1, 2016), https://www.kansascityfed.org/research/economic-bulletin/rise-international-shipping-costs-affect-us-inflation-2016/.

[66] Hannah Rubinton & Maggie Isaacson, *Shipping Prices and Import Price Inflation*, Fed. Rsrv. Bank of St. Louis Rev., 2d Quarter 2023, https://www.stlouisfed.org/publications/review/2023/02/08/shipping-prices-and-import-price-inflation.

CLASS ACTION COMPLAINT

International Monetary Fund similarly found that higher shipping costs reach the prices of imported goods within about two months and build to their peak effect on consumer prices roughly a year later.[67]

71.     These pass-through dynamics operated during the Class Period. The Indictment alleges that the prices of standard dry containers roughly doubled between 2019 and 2021, and that this occurred amid the COVID-19 pandemic, while the global supply chain was in crisis, when American consumers suffered shortages of goods and inflation surged.[68] During the same period, ocean-freight rates reached record levels: the FMC Assessment reported that the benchmark rate to ship a container from Shanghai to Los Angeles had reached roughly $8,470, down from over $10,000 and about quadruple the pre-pandemic rate.[69]

72.     The same corporate groups that manufacture standard dry containers also operate global container-leasing businesses. For example, COSCO SHIPPING Development Co., Ltd., the publicly held parent of Defendant Dong Fang, states that it is "mainly engaged in container leasing, management and sales, ranking third in the world in terms of scale with a global presence," in addition to operating as "the world's second-largest container manufacturer."[70] COSCO SHIPPING Development separately reported in its 2025 Annual Report that, as of the end of 2025, its container-leasing fleet "exceeded 4.1 million TEU, further consolidating its global leadership."[71]

73.     Defendants Florens Asset Management (USA), Limited and Florens Container, Inc. provided one such channel for the overcharge to reach U.S. customers. Florens is the global container-leasing arm of COSCO SHIPPING Development Co., Ltd., the same publicly held parent that wholly owns Defendant Dong Fang.[72] To the extent that Florens and its affiliates purchased standard dry

---

[67] Yan Carrière-Swallow, Pragyan Deb, Davide Fuceri, Daniel Jiménez, Jonathan D. Ostry, *How Soaring Shipping Costs Raise Prices Around the World*, IMF Blog (Mar. 28, 2022), https://www.imf.org/en/blogs/articles/2022/03/28/how-soaring-shipping-costs-raise-prices-around-the-world.
[68] Indictment ¶¶ 3–4, 44.
[69] FMC Assessment at 22.
[70] Company Profile, COSCO Shipping Dev. Co., http://en.development.coscoshipping.com/col/col5345/index.html (last visited May 28, 2026).
[71] COSCO Shipping Dev. Co., Annual Report 2025 (English Version), at 7 (2026).
[72] *See* COSCO Shipping Dev. Co., Annual Report 2025 (English Version), at 113–114 (2026); Florens Asset Mgmt. Co., *About*, https://www.florens.com/about#/info (last visited May 29, 2026) ("We are one of the world's largest container lessors that captures about one-fifth of the global market. We

shipping containers from Defendant Dong Fang or its co-conspirators during the conspiracy period, the supracompetitive prices Defendants charged for those containers were incorporated into Florens's lease rates and other charges to its customers, including customers in the United States.

74. The overcharges attributable to Defendants' conduct were therefore borne, in whole or in part, by indirect payers like Plaintiff who did not buy standard dry containers directly from Defendants, but who paid more for containers acquired indirectly, and for transportation services the cost of which incorporated the inflated price of those containers, than they would have paid in a competitive market.

## VIII.   DEFENDANTS' ALLEGED UNLAWFUL CONDUCT

### A.   Initial Coordination Among the Container Manufacturers

75. According to the Indictment, at least as early as March 2019, several of the conspirators began discussing a scheme to restrict the output and fix the prices of standard dry shipping containers.[73]

76. The Indictment alleges that on or about November 14, 2019, Yongbo Wan and Tianhua Huang of CIMC, Qianmin Li of Dong Fang, Yuqiang Zhang of CXIC, and a co-conspiring executive of Co-Conspirator Company A met at CIMC's headquarters in Shenzhen and agreed to restrict their output of standard dry shipping containers by various means, including:[74]

   a.   limiting the number of shifts and hours that each production line for standard dry containers could run per day;

   b.   installing video surveillance on all dry container production lines to ensure that the companies did not exceed the agreed-upon limitations;

   c.   not building any new container manufacturing factories; and

   d.   establishing a fund that included a mechanism to financially penalize any cheating on the output-restriction agreement.

---

operate a fleet of over 3.7 million TEU committed and available to international shipping and logistics communities, providing a wide range of products that include dry, refrigerated and other specialized types such as open-top, flatrack and tank.").
[73] Indictment ¶ 23.
[74] *Id.* ¶ 24.

CLASS ACTION COMPLAINT

77. The Indictment alleges that the goal of the agreement was to raise the price of standard dry shipping containers.[75]

78. Although there were no representatives from Singamas and Co-Conspirator Company B at the November 14, 2019, meeting, the Indictment alleges that the participants contemplated that those two companies would join the scheme later, and that they did so by at least as early as March 2020.[76]

79. The Indictment alleges that, on or about November 21, 2019, a co-conspiring Singamas executive emailed Siong Seng Teo of Singamas reporting that Qianmin Li of Dong Fang had called for "all the (6) factories" to meet on December 3, 2019 at Dong Fang's office in Shanghai, with an agenda described as "production capacity and healthy development of [the] container industry."[77]

80. According to the Indictment, on or about December 5, 2019, the same Singamas executive updated Teo on the December 3 meeting, reporting that representatives from all six factories had attended a meeting at Dong Fang's Shanghai office and had discussed (i) limiting the number of shifts and hours that each production line could run per day; (ii) building no additional new production lines; (iii) installing closed-circuit television in all production lines in March 2020; and (iv) having each factory submit a deposit that would be deducted if any factory broke the agreement. The Indictment further alleges that the Singamas executive reported having "reminded them not to be high profile since it might violate the Monopoly Law or being accused of price manipulation by our customers."[78]

**B.     The Agreement and the "Moon Gazing Fund"**

81. The Indictment alleges that, by February 2020, CIMC circulated to the six company conspirators a draft contract titled the Shenzhen Moon Gazing Equity Investment Fund (the "Moon Gazing Fund contract"), which, among other things, memorialized certain aspects of the agreement, and that in or around March 2020 the company conspirators held a ceremony at which they signed a final version of the Moon Gazing Fund contract.[79]

---

[75] *Id.*
[76] *Id.* ¶ 25.
[77] *Id.* ¶ 26.
[78] *Id.* ¶ 27.
[79] *Id.* ¶¶ 28–29.

CLASS ACTION COMPLAINT

82. According to the Indictment, the conspirators refined the operation of the agreement over time. By September 2020, they agreed to restrict how many standard dry shipping containers they would manufacture for particular "mainstream customers" or "mainstream clients," which included major United States-based container lessors, shipping lines, and logistics companies, as well as such companies based in Europe, the People's Republic of China, and elsewhere.[80]

83. The Indictment alleges that, on or about July 7, 2022, Singamas executives, including Siong Seng Teo, met to discuss the output-restriction measures, and that Teo stated Singamas "would prefer a monthly total quota instead" of a restriction on working hours per day. From at least as early as September 2022 until at least as late as November 2023, the conspirators allegedly agreed to cap the total cargo volume of containers they produced; and on or about November 20, 2023, Vick Ma co-presented to Teo the conspiracy's "Total Allowable capacity" and "allowable quota" for production, organized by each company conspirator and its factory lines.[81]

**C.     Monitoring and Enforcement of the Scheme**

84. According to the Indictment, the conspirators installed video-surveillance cameras at their factories to ensure that no company violated the agreed-upon output restrictions, installing in total about 87 cameras on 49 different container production lines at the company conspirators' factories.[82]

85. The Indictment alleges that the conspirators used the cameras to monitor compliance with the output restrictions, and that, in or around June 2021, Yongbo Wan of CIMC emailed Tianhua Huang of CIMC an audit of the company conspirators' production lines that included screenshots from the surveillance footage.[83]

86. To facilitate communications about the output restrictions, the Indictment alleges, the conspirators created a WeChat group and a list of contacts at each company conspirator, and Defendants Yongbo Wan and Tianhua Huang of CIMC, Qianmin Li of Dong Fang, and Yuqiang Zhang of CXIC were listed as the contacts for their respective companies.[84]

---

[80] *Id.* ¶ 30.
[81] *Id.* ¶ 31.
[82] *Id.* ¶ 33.
[83] *Id.* ¶ 34.
[84] *Id.* ¶ 35.

CLASS ACTION COMPLAINT

87. The Indictment alleges that the conspirators expressed a preference for discussing the output restrictions in person so as "to avoid the suspicion of industry monopoly," and describes an in-person meeting in or around February 2023 attended by Vick Ma of Singamas and a co-conspiring Singamas executive, together with Tianhua Huang and Yongbo Wan of CIMC, Qianmin Li of Dong Fang, and Yuqiang Zhang of CXIC.[85]

88. According to the Indictment, another in-person meeting took place in or around March 2024 at CIMC's Shenzhen headquarters, attended by Boliang Mai, Yongbo Wan, and Tianhua Huang of CIMC, a co-conspiring executive of Dong Fang, Yuqiang Zhang of CXIC, Vick Ma of Singamas, and two co-conspirator executives of Co-Conspirator Company A, to discuss output "control mechanism[s]."[86]

89. The Indictment further alleges that Defendants and their co-conspirators used the CCIA as a vehicle to coordinate and conceal the conspiracy: the conspirators "maintain[ed] and us[ed]" the CCIA to "promote, facilitate, police, monitor, and conceal" the charged conspiracy.[87] Consistent with that allegation, the FMC Assessment reports that the dominant Chinese container manufacturers, "aware of their market dominance," had "taken coordinated steps through [the] CCIA to suppress manufacture of containers, facilitating price increases."[88]

**D.    Efforts to Suppress Non-Conspiring Manufacturers and to Expand the Scheme**

90. The Indictment alleges that the conspirators worked to halt the growth of smaller standard dry container manufacturers that were not part of the conspiracy, and that, starting at least as early as 2020 and continuing periodically throughout the conspiracy, they discussed how to respond to those smaller manufacturers and gathered information on their output and customers.[89]

91. According to the Indictment, on or around August 7 and 10, 2023, the conspirators discussed waging "war" against smaller manufacturers outside the conspiracy, seeking "to strike back

---

[85] *Id.* ¶ 36.
[86] *Id.* ¶ 37.
[87] *Id.* ¶ 52(g).
[88] FMC Assessment at 20–21.
[89] Indictment ¶ 38.

CLASS ACTION COMPLAINT

by" launching "the price war against these small factories" to "signalize these small factories not to grab the orders in low price."[90]

92. The Indictment further alleges that, shortly after the conspiracy began, CIMC and Dong Fang sought to expand it to refrigerated shipping containers ("reefers"). Specifically, on or about May 15, 2020, Tianhua Huang of CIMC emailed the chief executive of a competing reefer manufacturer, stating that the standard dry container manufacturers had "reached a consensus and established industry self-discipline actions" to address "overcapacity," and suggesting that standard reefer manufacturers should likewise "act together," with "(a) No capacity increase, (b) All standard reefer manufacturers run one shift only." The Indictment alleges that the recipient declined, stating that "any such coordination is strictly forbidden by the compliance policies" of his company.[91]

**E. The Effect of the Conspiracy on Prices and Manufacturers' Profits**

93. According to the Indictment, on or about December 13, 2019, CIMC Chairman Boliang Mai emailed his subordinates Tianhua Huang and Yongbo Wan, as well as a CIMC executive, predicting that the price of 20-foot standard dry containers would rise to more than $2,000, and warned them not to forward his email.[92]

94. The Indictment alleges that, from 2019 to 2021, the price of a standard dry 20-foot container more than doubled from roughly $1,600 to over $3,500; the price of a standard dry 40-foot container more than doubled from roughly $2,800 to over $5,900; and the price of a standard dry 40-foot high cube container doubled from roughly $3,000 to over $6,000. From 2019 to 2022, the price of a standard dry 45-foot high cube container increased from roughly $4,100 to over $5,730.[93]

95. These allegations are consistent with the FMC Assessment, which reported that the price for a new container had risen to $3,500 per cost-equivalent unit (a measure of the value of a container as a multiple of a 20-foot dry cargo unit), compared with $1,800 per cost-equivalent unit in early 2020 and $2,500 per cost-equivalent unit in late 2020.[94]

---

[90] *Id.* ¶ 39.
[91] *Id.* ¶¶ 40–42.
[92] *Id.* ¶ 43.
[93] *Id.* ¶ 44.
[94] FMC Assessment at 21.

CLASS ACTION COMPLAINT

96.    The Indictment alleges that the conspirators' profits increased substantially during the conspiracy. According to the Indictment, the profits of CIMC's container-manufacturing business segment increased nearly one-hundredfold, from approximately 137 million Chinese yuan in 2019 (about $19.8 million) to approximately 1.99 billion yuan in 2020 (about $288 million) to approximately 11.3 billion yuan in 2021 (about $1.75 billion); and Singamas's net income increased from a loss of about $110 million in 2019 to profits of about $4.6 million in 2020 and about $186.8 million in 2021.[95]

97.    The Indictment alleges that the conspirators themselves remarked on the profitability the conspiracy produced. In or around May 2020, Dong Fang allegedly wrote to CIMC praising how cooperation on the production of standard dry containers had restored profitability to the industry; in or around April 2021, a Singamas executive emailed Siong Seng Teo reporting that, given "strong demand, container shortage, plus strict discipline in pricing and working hours," he believed all container factories had "significant increase in sales revenue and profit"; and in or around January 2023, co-conspiring Singamas executives wrote that the entire industry profited from the conspiracy in 2021 and 2022.[96]

98.    The price increases alleged in the Indictment were not the product of competition. According to the Indictment, they resulted from the conspirators' agreement to restrict output and fix prices,[97] and the FMC Assessment separately questioned whether the Chinese manufacturers, who were "notably slow in ramping up production," had done so as "part of a deliberate strategy to manipulate prices," and attributed the price increases in part to "coordinated steps" taken by the Chinese manufacturers to "suppress manufacture of containers."[98]

99.    Independent contemporaneous reporting and statements by industry participants further corroborate that the price increases were not the product of competition. In May 2021—during the conspiracy period alleged in the Indictment—John Fossey, head of container equipment and leasing research at Drewry, stated that, against a backdrop of falling container prices and "wafer-thin

---

[95] Indictment ¶¶ 45–46.
[96] *Id.* ¶ 47.
[97] *Id.* ¶¶ 4, 24, 50.
[98] FMC Assessment at 3, 20–21, 24.

CLASS ACTION COMPLAINT

margins," "the three main companies decided to try to support some kind of pricing for the dry freight boxes" and "basically got together and said, 'Look, we're not going to produce these containers at a loss.'"[99] Fossey reported that "[a]t the end of 2019 the price was just $1,650-$1,750 per TEU and they wanted a minimum of about $2,000," and that, by the end of 2020 and into 2021, container prices were "around $3,500."[100] Fossey also described the CCIA as the vehicle through which strategies of the major Chinese manufacturers were "to some extent controlled," adding that "CIMC, which is far and away the largest, really runs the CCIA."[101] On a quarterly earnings call in early 2021, Tim Page, then interim President and Chief Executive Officer of NYSE-listed container-equipment lessor CAI International, similarly told investors that the Chinese container manufacturers were "behaving differently than they have in the past," that they did not "have any interest in increasing production at the expense of price," and that they were "more focused on maintaining high container prices."[102] Fossey confirmed Page's observation, stating that "these factories could do two 12-hour shifts a day, but they don't want to flood the market with boxes because they want to keep the price where it is now or perhaps slightly lower," and that the factories "don't want to ever get back down to $1,750 or $1,800."[103]

100. Defendants' alleged overcharges were borne, in whole or in part, by indirect payers, including Plaintiff and the Class, who paid more for standard dry shipping containers, including as a component of the price of transportation or other services, than they would have paid in a competitive market.

### F.  Post-Indictment Activity

101. On April 14, 2026, Defendant Vick Nam Hing Ma, Marketing Director of Singamas, was arrested in France in connection with the conspiracy alleged in the Indictment. Defendant Ma's

---

[99] Greg Miller, *How Three Chinese Companies Cornered Global Container Production*, FreightWaves (May 24, 2021), https://www.freightwaves.com/news/how-three-chinese-companies-cornered-global-container-production.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

extradition to the United States is pending; the other six individual Defendants are believed to remain at large.[104]

102.    On April 30, 2026, Defendant Singamas confirmed the arrest in an inside-information announcement filed with The Stock Exchange of Hong Kong, signed by Defendant Teo, which disclosed that "an employee of the Group … has been arrested in a jurisdiction outside Hong Kong at the request of the United States Department of Justice … in connection with alleged anti-competitive conduct."[105] The United States Department of Justice publicly announced the charges on May 19, 2026, when the Superseding Indictment was unsealed. On May 20, 2026, CIMC and Singamas each filed announcements with The Stock Exchange of Hong Kong acknowledging that the United States Department of Justice had publicly announced criminal antitrust charges against them.[106]

## IX.    TOLLING OF THE STATUTES OF LIMITATIONS

103.    Plaintiff and the Class did not discover, and could not through the exercise of reasonable diligence have discovered, the alleged conspiracy until the existence of the criminal charges against Defendants became public. Before then, Plaintiff and the Class had neither actual nor constructive knowledge of the facts constituting their claims and had no reason to believe that the prices they paid were affected by Defendants' unlawful conduct.

104.    Defendants' alleged agreement to restrict output and fix prices was inherently self-concealing. By its nature, an agreement among competitors to limit production and raise prices, while publicly maintaining the appearance of independent competition, conceals itself from purchasers.

---

[104] Press Release, U.S. Dep't of Justice, *Four of the World's Largest Container Manufacturing Companies and Seven of Their Executives Indicted for a Global Conspiracy Affecting Billions of Dollars of Commerce* (May 19, 2026), https://www.justice.gov/opa/pr/four-worlds-largest-container-manufacturing-companies-and-seven-their-executives-indicted.

[105] Singamas Container Holdings Ltd., Announcement: Inside Information (Apr. 30, 2026) (HKEX).

[106] China International Marine Containers (Group) Co., Ltd., Voluntary Announcement Made Pursuant to Rule 13.51(2) of the Listing Rules (May 20, 2026) (HKEX); Singamas Container Holdings Ltd., Inside Information Announcement Made Pursuant to Rule 13.51(2) of the Listing Rules and Resumption of Trading (May 20, 2026) (HKEX).

105.    The Indictment further alleges that Defendants and their co-conspirators took affirmative steps to conceal the conspiracy throughout its existence.[107] For example, according to the Indictment:

    a.  In or around December 2019, after a Singamas executive reported on the meeting of all six conspirator companies, Siong Seng Teo wrote that the conspirators "also need to keep low key," and a co-conspiring Singamas board member stated that "[t]he discussion appeared to be anti-competition to me" and that the report made him "very uneasy," and asked whether they "should delete this string of emails after reading," to which Teo answered, "Yes I feel the same."[108]

    b.  In or around October 2021, while preparing a presentation to Singamas's board, a co-conspiring executive instructed another to delete the word "alliance" from a slide describing a "[m]anufacturing sector official and unofficial association/alliance" because it was "quite sensitive under anti-trust law."[109]

    c.  In or around March 2022, after a CIMC executive circulated a statement by a then-United States Federal Maritime Commissioner that "Chinese container manufacturing clearly took steps together to suppress the market prior to the pandemic" and "used their market power to control the market," CIMC Chairman Boliang Mai instructed his subordinates to pay close attention but to neither respond nor discuss.[110]

    d.  In or around March 2022, a co-conspiring Singamas executive advised that the topic of "market discipline" was "better not to put on the slide due to anti-trust issue" for an investor presentation of Singamas's 2021 annual results, and Siong Seng Teo agreed to amend the slide to "take out" certain words.[111]

---

[107] Indictment ¶ 48.
[108] Id. ¶ 48(a).
[109] Id. ¶ 48(b).
[110] Id. ¶ 48(c).
[111] Id. ¶ 48(d).

CLASS ACTION COMPLAINT

e.  In or around February 2023, a co-conspiring Singamas executive explained that "each mainstream box manufacturing group jointly signed an agreement on the healthy and sustainable development of the industry," but that "the specific content of the agreement was kept confidential at a very high level and could not be found out."[112]

f.  In or around March 2023, in minutes of a Singamas meeting, a co-conspiring executive "raised the concern about Anti-Trust violations" and the risk "of being sued by clients."[113]

106.  The FMC Assessment reflects that the dominant Chinese manufacturers operated through a trade association and took "coordinated steps" to suppress container manufacture and facilitate price increases.[114] The Indictment alleges that the conspirators maintained and used the CCIA to "promote, facilitate, police, monitor, and conceal" the conspiracy.[115]

107.  Defendants' publicly held parents have further continued to conceal the alleged conspiracy by attributing the post-conspiracy contraction in container manufacturing revenues and prices to ordinary market forces rather than to the end of the conspiracy. CIMC's 2025 Annual Report attributes the 30.86 percent decline in its container-manufacturing revenue and the 53.97 percent decline in its container-manufacturing net profit in part to "the decrease in gross profit margin of standard dry containers as a result of the intensified competitiveness"—not to the conclusion of the alleged conspiracy.[116]

108.  Singamas's annual reports follow the same pattern. The 2024 Chairman's Statement—signed by Defendant Teo before the Indictment was returned—shows a 119 percent year-on-year surge in Singamas's container production volume in 2024 (the final year of the alleged conspiracy), and attributes increased demand to "the Red Sea crisis," restocking activity ahead of the United States presidential election, and a possible United States East Coast dock strike, rather than to the end of the

---

[112] *Id.* ¶ 48(e).
[113] *Id.* ¶ 48(f).
[114] FMC Assessment at 20–21.
[115] Indictment ¶ 52(g).
[116] China Int'l Marine Containers (Grp.) Co., Annual Report 2025 (English Version), at 26 (2026).

CLASS ACTION COMPLAINT

conspirators' output-restriction agreement.[117] Singamas's 2025 Chairman's Statement—signed by Teo on March 26, 2026, after the Indictment was returned—in turn attributes the fall in the 20-foot dry container ASP from US$1,985 to US$1,752 to "overproduction," and "US tariffs and trade policies," and notes the group's decline in consolidated revenue and "lacklustre demand" without disclosing the conclusion of the alleged conspiracy or the pending criminal action.[118] Singamas's report does not identify the alleged conspiracy as a cause or contributing factor for the price and output changes in the financial statements.[119]

109.   By reason of the self-concealing nature of the alleged conspiracy and Defendants' affirmative acts of concealment, the running of any applicable statute of limitations was tolled with respect to the claims of Plaintiff and the Class under the discovery rule and the doctrine of fraudulent concealment. Plaintiff and the Class are also entitled to the benefit of any tolling resulting from the pendency of the related criminal proceedings to the extent provided by law.

## X.   CLAIMS FOR RELIEF

### COUNT ONE
### Conspiracy and Combination in Restraint of Trade Under State Law
### (Against All Defendants, on Behalf of the Damages Class)

110.   Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

111.   Plaintiff brings this Count on behalf of members of the Damages Class that purchased and/or resided in the states identified below.

112.   Defendants entered into an unlawful agreement that restrained, and continues to restrain, competition in the market for standard dry shipping containers. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for standard dry shipping containers.

---

[117] Singamas Container Holdings Ltd., 2024 Annual Report, at 8–9, 11, 14 (2025).
[118] *Id.*
[119] *See generally id.*

CLASS ACTION COMPLAINT

113.    As a result of Defendants' unlawful conduct, Plaintiff and Class members have been harmed by being forced to pay artificially inflated, supracompetitive prices for standard dry shipping containers, and for transportation services the cost of which incorporated the price of such containers.

114.    In formulating and carrying out the alleged agreement, understanding, contract, combination, and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

115.    Defendants' agreement had the following effects, among others: restricting the output of standard dry shipping containers and fixing, raising, maintaining, and stabilizing prices for such containers at artificially high, supracompetitive levels. A direct and reasonably foreseeable result of Defendants' conduct was to increase the price of transportation service for which the cost of dry shipping containers is a component.

116.    Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, maintain, or stabilize prices of, and to restrict the output of, standard dry shipping containers.

117.    There were no legitimate, non-pretextual, procompetitive benefits for Defendants' conduct, let alone any that outweighs its harmful effects on Plaintiff, Class members, and competition. Even if there were some conceivable procompetitive benefit, the conduct was not necessary to achieve such a purpose.

118.    By engaging in the foregoing conduct, Defendants engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)  Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b)  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c)  Col. Rev. Stat. §§ 6-4-104, et seq., with respect to Class members' purchases in Colorado and/or purchases by Colorado residents.

d)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

35

CLASS ACTION COMPLAINT

e) Del. Code Ann. tit. 6, §§ 2100, et seq., with respect to Class members' purchases in Delaware and/or purchases by Delaware residents.

f) D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by District of Columbia residents.

g) Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

h) 740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

i) Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

j) Kan. Stat. Ann. §§ 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

k) Me. Rev. Stat. Ann. 10, §§ 1101, et seq., with respect to Class members' purchases in Maine and/or purchases by Maine residents.

l) MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

m) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

n) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

o) Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

p) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

q) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

r) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

CLASS ACTION COMPLAINT

s) N.J. Stat. §§ 56:9-1, et seq., with respect to Class members' purchases in New Jersey and/or purchases by New Jersey residents.

t) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

u) N.Y. Gen. Bus. Law §§ 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents.

v) N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

w) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

x) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

y) P.R. Laws Ann. tit. 10 §§ 258, et seq., with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

z) R.I. Gen. Laws §§ 6-36-1, et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

aa) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

bb) Tenn. Code Ann. §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

cc) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

dd) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

ee) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

119. Plaintiff and Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that they have been forced to pay higher prices

37

CLASS ACTION COMPLAINT

for standard dry shipping containers, and for transportation services the cost of which incorporated the price of such containers, than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

120.    Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

**COUNT TWO**
**Violation of State Consumer Protection Laws − Unfair and/or Unconscionable Conduct**
**(Against All Defendants, on Behalf of the Damages Class)**

121.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

122.    Plaintiff brings this Count on behalf of members of the Damages Class that purchased and/or resided in the states identified below.

123.    Defendants and their co-conspirators agreed to fix the prices of, and to restrict the output of, standard dry shipping containers sold for use in United States import commerce, as alleged in the Indictment and herein. Defendants' conduct constitutes unfair competition and unfair and unconscionable acts or practices in violation of the consumer protection laws of the states identified below.

124.    There was and is a gross disparity between the price that Plaintiff and Class members paid and the value they received. Prices for standard dry shipping containers would have been lower, and the output of such containers would have been greater, but for Defendants' unfair competition or unfair and/or unconscionable conduct. A direct and reasonably foreseeable result of Defendants' conduct was to increase the price of transportation service for which the cost of dry shipping containers is a component.

125.    As a direct and proximate result of Defendants' unfair competition or unfair and/or unconscionable conduct, Plaintiff and Class members were forced to pay higher prices for standard dry shipping containers and for transportation services, the cost of which incorporated the price of such containers, than they would have paid but for Defendants' unlawful conduct.

38
CLASS ACTION COMPLAINT

126. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

127. There are no countervailing benefits to Class members, and any utility of Defendants' conduct is outweighed by the consequences to Class members.

128. Defendants violated the following consumer protection laws by engaging in anticompetitive conduct, which amounts to unfair competition or unfair and/or unconscionable conduct and business practices in violation of the following consumer protection laws:

    a) Alaska Stat. Ann. §§ 45.50.471, et seq., with respect to Class members' purchases in Alaska and/or purchases by Alaska residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

    b) Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to Class members' purchases in California and/or purchases by California residents. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members. Defendants' conduct also constitutes an unlawful business practice in that it violates the Sherman Antitrust Act and various state antitrust laws.

    c) Cal. Civ. Code §§ 1750, et seq., with respect to Class members' purchases in California and/or purchases by California residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

    d) Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases in Florida and/or purchases by Florida residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Class members.

    e) Haw. Rev. Stat. §§ 480-2, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

CLASS ACTION COMPLAINT

f)  Idaho Code Ann. §§ 48-601, et seq., with respect to Class members' purchases in Idaho and/or purchases by Idaho residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

g)  Ind. Code §§ 24-5-0.5-3, et seq., with respect to Class members' purchases in Indiana and/or purchases by Indiana residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

h)  La. Rev. Stat. Ann. §§ 51:1401, et seq., with respect to Class members' purchases in Louisiana and/or purchases by Louisiana residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

i)  Mo. Rev. Stat. §§ 407.010, et seq., with respect to Class members' purchases in Missouri and/or purchases by Missouri residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

j)  Mont. Code §§ 30-14-101, et seq., with respect to Class members' purchases in Montana and/or purchases by Montana residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

k)  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

l)  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to Class members' purchases in Pennsylvania and/or purchases by Pennsylvania residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

m) S.C. Code Ann. §§ 39-5-20, et seq., with respect to Class members' purchases in South Carolina and/or purchases by South Carolina residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce.

n)  Vt. Stat. Ann. tit. 9, § 2453, et seq., with respect to Class members' purchases in Vermont and/or purchases by Vermont residents. Defendants engaged in unfair methods of competition, unfair practices, and unconscionable conduct in the conduct of trade and commerce.

CLASS ACTION COMPLAINT

129.    Plaintiff and Class members have been injured in their business and property by reason of Defendants' unfair competition or unfair and/or unconscionable conduct. Their injury consists of paying higher prices for standard dry shipping containers, and for transportation services the cost of which incorporated the price of such containers, than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

130.    On behalf of itself and the Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

**COUNT THREE**
**Violation of State Consumer Protection Laws − Fraudulent and Deceptive Conduct**
**(Against All Defendants, on Behalf of the Damages Class)**

131.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

132.    Plaintiff brings this Count on behalf of members of the Damages Class that purchased and/or resided in the states identified below.

133.    Defendants violated the following consumer protection laws by engaging in fraudulent and deceptive conduct, including by concealing the existence of their price-fixing and output-restriction agreement and by representing their pricing as the product of independent competition, when in fact prices and output were the result of an unlawful agreement among Defendants and their co-conspirators:

a)  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

b)  Colo. Rev. Stat. § 6-1-105(1), with respect to Class members' purchases in Colorado and/or purchases by Colorado residents.

c)  Va. Code Ann. §§ 59.1-196, et seq., with respect to Class members' purchases in Virginia and/or purchases by Virginia residents.

134.    Plaintiff and Class members have been injured in their business and property by reason of Defendants' fraudulent and deceptive conduct. Their injury consists of paying higher prices for

41

CLASS ACTION COMPLAINT

standard dry shipping containers, and for transportation services, the cost of which incorporates the price of such containers, than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

135.    On behalf of itself and the Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

## COUNT FOUR
**For Declaratory and Injunctive Relief for Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26**
**(Against All Defendants, on Behalf of the Nationwide Injunctive Class)**

136.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

137.    Plaintiff brings this Count on behalf of the Nationwide Injunctive Class.

138.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

139.    As set forth in the preceding Counts, Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

140.    Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations. Their injury consists of paying higher prices for standard dry shipping containers and for transportation services whose costs incorporate the price of such containers than they would have paid in the absence of those violations. These injuries will continue unless halted.

141.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Section 1 of the Sherman Act.

142.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct and to restore competition in the market for standard dry shipping containers.

42
CLASS ACTION COMPLAINT

**COUNT FIVE**
**Unjust Enrichment**
**(Against All Defendants, in the Alternative, on Behalf of a Nationwide Class)**

143.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

144.    Plaintiff brings this Count in the alternative to Counts One, Two, and Three, on behalf of itself and a nationwide class of all persons and entities in the United States, including the District of Columbia and Puerto Rico, that, during the Class Period, indirectly paid for the cost of one or more standard dry shipping containers, including as a component of the price of transportation or other services, that were manufactured by one or more Defendants or co-conspirators, for their own use and not for resale.

145.    Defendants have been unjustly enriched at the expense of Plaintiff and Class members as a result of the unlawful conduct alleged herein. Defendants and their co-conspirators conspired to restrict the output of, and to fix, raise, maintain, and stabilize the prices of, standard dry shipping containers, causing Plaintiff and Class members to pay supracompetitive prices for standard dry shipping containers, and for transportation services the cost of which incorporated the price of such containers.

146.    Plaintiff and Class members conferred a benefit on Defendants in the form of the overcharges paid on standard dry shipping containers manufactured by Defendants and their co-conspirators. Defendants knowingly accepted and retained that benefit under circumstances that render such retention inequitable.

147.    It would be inequitable for Defendants to retain the supracompetitive overcharges they obtained through their unlawful conduct. Plaintiff and Class members are entitled to restitution and disgorgement of all amounts by which Defendants have been unjustly enriched, including the supracompetitive overcharges and any profits, gains, or revenues derived therefrom.

148.    To the extent any Defendant contends that the price-fixing and output-restriction agreement alleged herein, or any part of it, was lawful or did not violate any state antitrust or consumer protection statute, Plaintiff and Class members are nonetheless entitled to restitution under principles

43
CLASS ACTION COMPLAINT

of unjust enrichment, assumpsit, quantum meruit, money had and received, or quasi-contract, as recognized under the laws of each of the several states, the District of Columbia, and Puerto Rico.

149.    Plaintiff pleads this Count in the alternative, to the extent that Plaintiff or Class members in any Class State do not have an adequate remedy at law under Counts One through Three.

## XI.    ADEQUATE REMEDIES AT LAW

150.    To the extent that equitable relief is sought under any of the above claims, Plaintiff pleads such claims in the alternative to any legal claims and further pleads that its legal claims do not provide adequate remedies at law. Until discovery and other pretrial matters are complete, the extent to which the legal claims above may provide the same relief for the same harms as could be available under claims providing equitable relief is unknown. Restitution may, for example, be measured differently than legal damages and provide for a different amount of relief, as may non-restitutionary disgorgement. The difference between the value of any restitutionary and any legal relief will therefore be unknown until, at the earliest, the completion of expert reports and discovery. Nor is it yet known whether recovery under Plaintiff's legal claims would be as prompt or certain as a recovery pursuant to equitable relief.

151.    Under statutes where only equitable remedies are available for claims of unfair, unlawful, or unconscionable conduct (such as claims under the California Unfair Competition Law), legal claims that prohibit fraudulent conduct would not be adequate to provide relief for such unfair or unconscionable conduct. In other instances, equitable claims broadly prohibit fraudulent conduct, whereas legal claims may only prohibit specifically enumerated types of conduct. In addition, claims alleging unfair or unconscionable conduct or unjust enrichment are brought against numerous Defendants and thus seek relief that is different and does not correspond to the relief sought by way of Plaintiff's legal claims. The legal claims thus do not inherently provide the same relief for the same harms as the equitable claims.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests that the Court enter judgment and grant relief as follows:

a.    Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b.    Adjudging and decreeing that Defendants' conduct alleged herein—including their contract, combination, or conspiracy in unreasonable restraint of trade and their unfair, unconscionable, fraudulent, and deceptive business practices—was unlawful and in violation of the federal and state antitrust, unfair competition, and consumer protection laws pled in this Complaint;

c.    Awarding Plaintiff and the Class all monetary relief available under the claims pled herein, including actual, compensatory, statutory, and multiple or treble damages where permitted by law, as well as restitution and/or non-restitutionary disgorgement in the amounts by which Defendants were unjustly enriched, in an amount to be proven at trial;

d.    Granting declaratory and injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) and the federal and state antitrust, unfair competition, and consumer protection laws pled in this Complaint, enjoining Defendants and their officers, agents, and employees from continuing or renewing the unlawful conduct alleged herein;

e.    Awarding pre-judgment and post-judgment interest at the maximum rate allowed by law;

f.    Awarding Plaintiff and the Class their reasonable attorneys' fees and costs of suit as permitted by law; and

g.    Granting such other and further relief as the Court deems just and proper.

## XIII.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of the Class, demands a trial by jury of all issues so triable.

Dated: June 2, 2026                                 Respectfully submitted,

By: */s/ Dena C. Sharp*
Dena C. Sharp (SBN 245869)

45

CLASS ACTION COMPLAINT

Adam E. Polk (SBN 273000)
Kyle Quackenbush (SBN 322401)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com
Email: kquackenbush@girardsharp.com

Roberta Liebenberg (pro hac vice forthcoming)
Jeffrey Gittleman (pro hac vice forthcoming)
Sandra L. Duggan (pro hac vice forthcoming)
**FINE, KAPLAN & BLACK R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
Email: rliebenberg@finekaplan.com
Email: jgittleman@finekaplan.com
Email: sduggan@finekaplan.com

*Attorneys for Plaintiff and the Proposed Class*

46

CLASS ACTION COMPLAINT